The last case today is number 23-10137, Annette Davis v. Great Northern Insurance Company. Mr. Chucid. Good morning, your honors. I guess this is the second insurance coverage case that you heard this morning. There are others coming down the road this week, so come on over if you're interested. I could only imagine, I could only imagine. It also involves a twist with a covalence agreement. Briefly, by way of background, the underlying case litigated for three and a half years on the eve of trial is when the covalence agreement was entered into. My client owned a unit at the Tides Bridgeside Square condominium. They were doing some work on the water cooling tower. Major leak. Water enters into four different units. They clean up three units. They don't clean up her unit. She's unknowingly exposed to aspergillus for three and a half years. Unfortunately, she was immunocompromised, and when the aspergillus hit her body, it wiped out completely her immune system. So now my client must undergo, every three weeks, it's called IVIG, intravenous immunoglobulin therapy, without which she would have no working immune system. For every three weeks for the rest of her life, at a cost of about $13,000, she gets hooked up to a pole and gets antibodies from other people. Otherwise, she has no immune system. So let's talk about the district court had a number of bases for granting summary judgment against you. So let's talk about the, if we could, the district court's conclusion that Chubb never refused to defend Ackam. Because in the district court's view, right, I'm not asking you to accept this, but if I mischaracterize what the district court thought, you can tell me. The district court thought that under a reservation of rights, actually under two reservation of rights, Chubb offered at the end of the, at the tail end of the process, offered defense to tag on to the other lawyers who were involved in the defense of Ackam in the case and said, we want to participate and hire this lawyer for you. And the district court thought that that was not a refusal to defend or indemnify. So tell me why the district court got that wrong. Sure. First of all, what we have here are two separate stacks of coverage. Ackam was the property manager. It had its own stack of coverage through Chubb for $11 million. Under the management agreement, the association was required to name the property manager as an exclusive coverage. The $26 million worth of coverage under the Amtrust policies had a very clear mold exclusion. However, on the other side of the equation, Ackam's own insurance policies with Chubb, there was no mold exclusions. Unfortunately, the lower court really, the lower court really misconstrued what was going on here. There was no reservation of rights, defense on the reservation of rights until the tail end. What had happened was Amtrust was defending because there was minor property damage. They clearly were defending on the reservation of rights, specifically saying that there is no indemnity obligation for mold related damages. That is Ms. Davis' damages. So it was very clear to Chubb that although the other insurer was defending, at the end of the day, they weren't going to pay anything. The position that Chubb took... But they ended up paying. They did. What they paid, your honor, was $250,000 because they were defending. The case had cost them a million dollars. This is Amtrust. Cost them a million dollars already. And they estimated with the eight experts, it was going to cost another $500,000. So to stop the bleeding, and you have the testimony of David Hahn, who happens to be a lawyer. He's been doing insurance adjusting for 40 years. He said, we wanted to stop the bleeding. That was not an indemnity payment. That was clearly a voluntary payment so we could end this case. But if we look at the position that the district court adopted and that Chubb has adopted in this case, it all relates to the other insurance provision. Now, the Pavareni case, and there's a whole line of cases that say, we don't get into the coverage analysis between the other insurance provisions in both stacks unless we have the same risk that's being insured. The same risk is not being insured. Under Amtrust, there's a mold exclusion. Under Chubb, there's no mold exclusion. I get all of that. But the district court thought that because Chubb sent out the two letters under reservation of rights and offered to retain counsel, that that was enough, and that it hadn't refused coverage. And by the way, in the district court's view, those letters said this is not a denial of coverage or indemnity. So why did the district court get that wrong? Okay. First of all, your honors, the two letters that were sent out by Chubb, they were reservation of rights under six policies. Understand that the Chubb stack, there were three consecutive primary policies and three consecutive excess policies. The court got it wrong because if you look at the other insurance provision by which Chubb is hanging their hat, and unfortunately the lower court did, it doesn't apply. Now, they sent out- What doesn't apply? The other, you don't get into an examination of the other insurance provisions, a priority of coverage analysis because they insure different risks. It's no different, your honor, than you having an auto policy and then you have a liability policy. They're two different risks. How could one be other insurance for the other? Okay, but I don't want your time to run out without you trying to answer my question. Yes, sir. We'll answer that question. Okay. What the court got wrong was the judge believed that the two reservation of rights letters that were 22 pages long, they offered to defend on the reservation of rights. No, they just issued a reservation of rights and said we're excess. It wasn't until the 11th hour in December of 2020 that Chubb woke up and said, hey, we want to engage co-counsel. Mr. Marino, who represented ACAM, said, okay, you waited two and a half years, now you're telling me you want to get involved in the defense, you want to hire Pete DeMahie, tell me what the conditions are. What's the terms? Mr. Marino negotiated from December until April the terms of that defense. Originally, they reserved rights under the three primary and the three excess. Okay. Then after going back and forth for several months, they told Mr. Marino, look, we will agree to defend under one policy period. And Mr. Marino said, no, your reservation of rights under three consecutive primary, three consecutive excess, so you agree to defend us and you agree to indemnify us. That never happened. So Mr. Marino, which he has the right to do, and there's lots of case law that say that when an insurer agrees to defend you on the reservation of rights, you have the right to determine what's the basis of the reservation of rights. Chubb could have did what they did all along. They could easily said, you know what? There's no coverage here. You need to collect it. Now, if you look at the position that Chubb took and it's really set forth and it's in the record, it's the letter from Chubb's counsel, February 14, 2019. I did a demand for policy limits for $11 million. Their response was this. There is no coverage under the Chubb policies until the $26 million in coverage under the Amtrust policies are exhausted. How could that ever happen? There's a mold exclusion. Let's move. Never happened. You're running out of time. So let's, let's move to another reason the district court gave, which was that as a matter of law, the Koblenz settlement amount was unreasonable. First of all, your honor, the evidence, the record below is very clear that Ms. Davis needs this IVIG every three weeks for the rest of her life. Just the economic damages alone are $22.3 million. She didn't ask for that. I think that's also cited in the district court's order that the amount she, the millions of dollars that she eventually was awarded was so far outside of what she was even asking for. Well, let me explain that to you. First of all, I did an $11 million policy limits demand that was rejected. At mediation, my demand was much higher. Looking, looking at this court's basically guidelines by which Koblenz agreements are enforceable. You have this, the Sidman case and you have, um, oh geez, you have another case that basically says you have to negotiate this thing. You can't just pick a number out. Now, in this case, what had happened was ACAM and the association realized they'd lost summary judgment. They lost motions in limine. They saw that things were getting bad real quickly. Um, and they had no coverage, no coverage because the, the, uh, Amtrust policies were saying mold exclusion, not covered. And their own insurer was saying, I'm sorry, you got to collect $26 million from them. So what had happened was we negotiated an amount, and this is a really important factor that, uh, was actually the Sidman case that this court considered. This wasn't a complete rollover by ACAM when they said, all right, you know what, we'll give you $100 million. ACAM out of their own pocket, they paid $250,000 and the association paid a million dollars. It was $1.25 million that was paid. Now, $250,000 did come from the insurer as a cost of defense, but out of their pocket was a million dollars. And this amount was negotiated. It started off at $20 million in December. And then that amount went down to 14.5, which is only 64.8 per six, 64.86% of the economic damages. Where can I find, where can I find in the record references to or evidence of the demands, the million dollar demands that were made by you on behalf of Ms. Davis? Okay. So if we take a look, the February 14, 2019 letter that I referenced where Chubb took the position, got to collect it from them, can't collect from us, starts off by saying, as you know, our firm is coverage council for great Northern and federal insurance. We have your correspondence regarding your client's demand for $11 million. Okay. That was my demand because that was the policy limits, the combined policy limits. Okay. And then, and then you said there was a higher demand at or after mediation. It was a higher demand and you'll see it. It's, it's where is that about? You know, my demand for $25 million and they spoke about how that's possible, but they don't think it's, you know, they don't think it's going to happen. So, so again, your honors real briefly, if I may, you need to wrap up cause you're saving your time for rebuttal. Yeah. Yeah. Okay. So this really comes down to, is there coverage under the Chubb policies? There is. Is the amount reasonable in light of the record evidence before the court, just $22.3 million in economic damages without pain and suffering. Okay. It was negotiated. It was negotiated over a six month period. And again, the amount to the consent judgment and the amount that they paid out of pocket were all negotiated. It was clearly in good faith. Okay. Thank you. We'll give you your time for rebuttal. Thank you. Mr. Bahadurin. Thank you, your honor. May it please the court, Sina Bahadurin here for Appalese. Listening to the colloquy just now, I think there might be some confusion because there are a number of correspondence that was involved and I'd like to actually start by framing what the inquiry is. This case is about a wrongful refusal to defend and at summary judgment, as well as in the initial brief, the one letter that was identified as being the disclaimer letter was the February 14th, 2019 letter. You actually asked Judge Jordan about some of the letters that had happened. And I think you were looking towards the end of the case immediately before the Koblentz, whereas counsel then came back and said, no, it's about February 14, 2019 letter. That's really, really important here because again, the crux of being able to enter into a Koblentz agreement is a wrongful refusal to defend. So if I may, I'd like to zero in on that because the dates are incredibly important. So suit was filed April, 2018. Acom immediately tenders to Amtrust. Amtrust picks up the defense. They immediately provide a full defense and unfettered defense. Several months later, Acom gets around to tendering to Chubb. That's in July of 2018. October 9, 2018, Chubb issues a reservation of rights letter. It's not in dispute that it was a reservation of rights letter. What does it agree to do in that reservation of rights? It agrees to monitor the case because... That's not a defense. But your honor, they didn't need to provide a defense because... It's not a defense, right? No, but they were excess. And that's the whole purpose of... They're not excess. Yes, under the other... They're primary. They have primary coverage responsibility in this case. Yes, but if you think about the US Fire versus Mike's case, there can only be one carrier that assumes the full duty to defend or another carrier can have a duty to defend, but it's consecutive. So they came in after the fact. So at that point, again, there's nothing in the record to suggest that there's any dispute that that October 9 letter was an ROR. It uses the... Let me try to understand Florida insurance law. If at that point after that letter, ACAM demands that Chubb underwrite part of the defense, either by providing a lawyer or paying part of the fees for the lawyer that Amtrust has chosen, what is Chubb's responsibility in terms of responding? What does Chubb have to do? So I think that Chubb would engage in dialogue with his insurance... Not dialogue. What does it have to do? At the end of the day, regardless of what its decision is, it has to communicate that decision to ACAM, right? Correct. Correct. We will not provide a defense or we will do this, but not that, right? That's right. And that correspondence never happened, Your Honor. It was complete silence in response to the October 9th letter. And so that was the first ROR. And that's the standard that everyone agrees is there has to be a disclaimer, a wrongful disclaimer. An ROR, and this is the Travelers versus Royal Oak decision, which last time I checked had been cited 400 times. It's a seminal part of Florida law, which is what does an ROR mean? An ROR is just that. A carrier is communicating with its insured that there are a number of defenses that could apply and otherwise conveys its position. So that was October 9, 2018. Everyone agrees that was an ROR letter. Several months after that, counsel writes a letter and says, Chubb, I want you to pay $11 million. After that correspondence, Chubb issues a second ROR letter. Again, if you look at the briefing, both at the district court level as well as the and it's not a disclaimer. Six days after the second ROR is when counsel for Chubb, me, writes to counsel for Davis and says, hey, we've got your demand. We disagree with your assessment on liability and damages. And oh, by the way, ACIM is entitled to complete contractual indemnity under the is primary. And the tide is being fully defended. That's the policy. It has the mold exclusion. It has an organic pathogen exclusion. Same thing. Because mold is an organic pathogen. I think that's right. But it's the impact of the exclusion that matters, right? And so that's why it's a counterfactual, I'd submit, Your Honor, to think about what Amtras could have done. Because what we know is that Amtras spent 750 of what Amtras would have done. I'm thinking of what Chubb is thinking. Chubb is looking at a policy that says organic pathogen exclusion. Uh-oh. We're going to be on the hook, potentially. So we got to do something. Yes. But what does Chubb do? But if we could be more precise about that, there's an organic pathogen exclusion. But does that eliminate the duty to defend? In Amtras' mind, no, it didn't. Because there was enough in that complaint to to defend is broader than the duty to indemnify under Florida law. Correct. But that doesn't save Chubb on the indemnity side. No, but that's the issue, Your Honor. We never got to indemnity. What we do know is that not only did Amtras spend $750,000 defending, they waived their right to reimbursement, which they could have gotten if they thought they didn't know coverage to begin with. And they also paid $250,000 in indemnity. That's a confession to judgment. That's why I'd submit that this entire case is so awkwardly postured in the sense that you've got a plaintiff stepping into the shoes of the defendant to argue what the defendant's primary insurer should have argued to try to access coverage under that defendant's excess policy. We don't need to indulge what could have happened. We can just look at the record. And back to the February 14, 2019 letter. If that was a disclaimer, immediately after that, there was more correspondence that happened. Davis responded to the letter, the February 14 letter. Nowhere in that correspondence did counsel say, you disclaimed coverage, Chubb. What are you doing? There's no mention of it whatsoever. And then there's also, this is important to think about the chronology as well. So that's February 14, 2019. It's not until 2021 that anybody goes back in time to try to argue that the February 14 letter was a disclaimer. That's the first time you hear about it. Well, what happened during that two-year period? Chubb fully evaluated the case. Chubb was at mediation. Chubb spoke to defense counsel. Chubb received attorney-client privilege reports from defense counsel that was fully defending the case. That's not the conduct or indicia that you'd expect that anyone thought that somehow Chubb had disclaimed coverage. It wasn't until 2021 when on the eve of trial, Chubb sees that the case is going to trial and says, you know what? We want to contribute. We want to help out by bringing in counsel. And in response to, if you look at the correspondence that happens right immediately before the covalence agreement, no one ever says, why are you writing to us? Why are you offering to participate in the defense? You disclaimed coverage years ago. Instead, what counsel says is, we don't want you participating in the defense. And then there's more correspondence back and forth that happens. And eventually, counsel says, look, we'll let you participate if you withdraw your reservation of rights. And so Chubb, knowing what's coming, because unfortunately covalence agreements are popular under Florida law, Chubb writes back and says, this is on February 12, 2021. Chubb will also agree to withdraw its reservation of rights under the 2013-14 primary and excess policies in order to allow us to move forward with associating Mr. DeMahie. No response. March 31, 2021. Counsel writes again to ACAMS Coverage Counsel. We're following up. No response. And then you have the covalence agreement itself. All of this... Well, because the argument that counsel just made is because you said a lot of unreasonable demands as a precondition to providing that defense coverage. You're denying all of that? Your Honor, I'm not aware of any demands that were imposed. All Chubb said was that we want to help with the defense by associating in counsel. Beyond that, there was no other correspondence that happened. Again, the crux of the appeal, and this is incredibly important, is that there was a disclaimer of coverage on February 14, 2019. You're saying there was an unconditional withdrawal of reservation of rights by Chubb? That's right. That was on February 12, 2021. Again, because this is Florida. You know when a covalence agreement is coming, and so Chubb was interested in neutralizing that possibility, so they all together withdrew the reservation of rights under the 2013-14 policies, which is the same policy period that counsel sued on. All of this was very important to Judge Stengel. I just don't want you to lose your time. Could you turn to the reasonableness of the settlement at some point? Yes, absolutely. In terms of reasonableness, that only becomes relevant, just to make that point, Judge Brasher, if there was a wrongful refusal to defend. If there was not, then to some extent reasonableness and collusion becomes moot. Florida law is clear that there is a significant amount of skepticism with covalence agreements because of the moral hazard. The case law, Sidman and others make clear that in this situation, insured has nothing to lose. And so for that reason, they go into it, the risk of loss is entirely on the plaintiff. So long as they get a covenant not to execute, it's not their problem. Here, there's a lot of issues with reasonableness and collusion. So the most pressing is what defense counsel, I'm sorry, what Acombs Coverage Counsel did not do. He did not educate himself in any way on what was going on in the case. Again, this was a $750,000 defense. The record is clear. He was not qualified to value a personal injury case. He didn't read any of the detailed reports that defense counsel had. Amtrust hired counsel that was unqualified. No, no, no, no, your honor. Acombs Coverage Counsel is the one that handled the negotiation on behalf of Acombs. So Acombs Coverage Counsel negotiated the covalence agreement. Separately retained coverage counsel, not the counsel secured by Amtrust. That is correct. That is correct. But defense counsel hired by Amtrust prepared detailed reports. Let me talk about those reports for a second. Yeah. Because there are these allusions in the record about 20% chance of prevailing at trial, right? Correct. Weren't those estimates? I'm sorry to interrupt you, your honor. It was a 20 or 30% chance of a defense verdict. So I flipped it around. I have it wrong? Yes. Yes. Why isn't that deadly for you? No, no, no. Maybe I'm phrasing it incorrectly. There was a 70 to 80% chance of a defense verdict. Right, right. I thought I had it right. Okay. Okay. Yeah. Yeah. Weren't those estimates provided before the district court denied the trial court denied the motion for partial summary judgment? Yes, but it was asked to alliance, which was a co-defendant. It doesn't matter. Correct. I mean, you got to take that into account. I mean, I can only speak from prior experience a long, long time ago, but your estimation of chances of success on the plaintiff's side go up as defense counsel. One summary judgment gets denied in any way, shape or form. You're like, Oh, there's something out there. And the client gets a little bit antsy too. Yes. And so you can't take, well, my only point is at summary judgment, you can't take those 20 to 30% estimates at face value. Can you? No, I think that's a fair assessment that perhaps that percentage might've moved, but that's okay. Let's keep, let's keep going then. That still doesn't get you. Hold on, hold on, hold on. I'm going to tell you where my concerns are. The district court said that it was concerned because the $14.5 million Koblan settlement was 58 times the pretrial settlement range. Yes. And because it was more than three times any settlement requested by Davis at mediation or whatever, but those don't take into account the $11 million that were demanded by Ms. Davis earlier on the 20 something million dollar that was demanded by Ms. Davis at some later point. And it doesn't take into account the valuation of her purely economic damages by her experts, which exceed 20 million. If you take all of that into account and you're looking at totality of circumstances for reasonable reasonableness through a summary judgment prism, why is this unreasonable as a matter of law, particularly when the insured paid out of its own pocket an amount of money? Okay. So on that, if I may answer that last part first, the insured did not pay out of pocket. Council is confusing the tides, which is the condo association with ACOM, which is the only insured. The tide paid a million, right? The tides paid a million. ACOM paid zero. ACOM paid zero. And Amtrust paid 250. And Amtrust paid 250 on behalf of ACOM and the tides. All right. But to your other... How about the other things in the record viewed through the lens of summary judgment? Yes. So I think the context again, back to the chronology here, it's incredibly important. The demand for 11 million was in January of 2019. In April of 2019, there was a PFS. That one was for 3.7 million. In June of 2019, there was another PFS that was for 2.9 million. That's not trending in terms of the value of the case going up. There's nothing, to my knowledge, I stand to be corrected on this, that there was ever any other demands for the life of the case. I'm not aware of any. But the other points that I think are important too... When was summary judgment denied? When was the summary judgment denied? The summary judgment was denied July of 20. Okay. So are their demands post the denial of summary judgment that are relevant? I may have got my chronology wrong, but the two demands that you just... Those were before summary judgment. Those were before summary judgment. Okay. But going back to the process that happened here, the $14.5 million covalence agreement was negotiated by Acom's Coverage Council in three hours via email. Three hours via email. And he testified, he did not review any of the defense reports. He didn't know that Ms. Davis needed and was trying to get IVIG treatment since 2013 before the accident ever happened. He didn't read the defense report. He was not qualified to engage in a negotiation process. And if you look at a case like Jimenez, mindful that that was at trial, the court very much... Bench trial, the court talked about what was the process that happened? What was counsel looking at? What factored into their analysis? The other thing to mention here... So it was another... The district court didn't take that into account. No, the court did not. So your argument is, I don't want to put words in your mouth, that the district court got the results right, but the reasoning might not have been as thorough as necessary. Yes. As a litigant, we always hope for more verbosity and more words, but I understand that the court got to the crux of it. And I think the court could have stopped on just the issue of the wrongful refusal to defend, but he addressed the other issues as well. One final point, because I know I'm over my time. There was another covalence agreement in this case. This wasn't the only covalence. There was a covalence agreement against Alliance, the company that was hired to do the dryout of which is in the record. Davis represented that the value of her case was $10.7 million. Is it $10.7? Is it $14.5? This goes back to the moral hazard that's inherent in all of these covalence agreements. The insured has nothing to lose. They'll sign off on whatever numbers put in front of them. The burden lands on the party that's entering into the covalence agreement. Okay. Thank you very much. Thank you very much. Okay. Let me start off by correcting the record. Okay. First of all, summary judgment was granted by the trial court in July of 2020. That's when summary judgment was granted. You mean denied? No. We filed a motion for partial summary judgment of unlicensed mold remediation against the Tides, ACAM, and then it was Alliance who was the mold remediator. The court granted partial summary judgment saying that what happened in July of 2020 was unlicensed mold remediation. That's before all these evaluations. Then there's a follow-up I thought there was also a denial of summary judgment on the defense side. Am I wrong about that? It was a denial of summary judgment on the issue of whether there was a wrongful retention of the Alliance who was the contractor. Yeah. Yeah. That was the summary judgment, but the summary judgment that's at issue here, which is really why things fell off the cliff for the defense, is the court granted summary judgment on unlicensed mold remediation. That's when Tom McCausland, if you read the whole record in July of 2020, he says, wait a second, we need to regroup here. The court just granted summary judgment. That's when things changed. Another factor that's just simply not true, ACAM paid $100,000 out of their own pocket. Then Amtrust on behalf of ACAM paid $150,000. ACAM paid $100,000. The Tides paid $900,000 out of their own pocket and Amtrust paid $100,000 for them. Amtrust, just to get the case over, paid $100,000 for the Tides and paid $150,000 for ACAM. ACAM came out of pocket here. But the level of, I guess, risk you would agree was not the same if we look at the ultimate award and the reasoning behind that. Clearly, once the summary judgment was entered against the defendants, including ACAM, their risk went up. Tom McCausland, whose deposition was taken, Mr. McCausland defended the case on behalf of Amtrust. He said things changed significantly there because of the summary judgment. They also lost motions in limine on boardable damages. They knew what was going on. As a matter of fact, in the record is the testimony of Mr. Marino. Mr. Marino said that he spoke to Tom McCausland and Seth Goldberg, two partners that defended the case. They said that things were getting considerably worse, that the court entered to Mr. McCausland. He looked at Ms. Davis's, the life care plan. He looked at the medical expenses and he made an informed decision. What was ACAM supposed to do? Here you have Amtrust saying, we're not, we have a mold exclusion. We're not going to pay anything. And, excuse me, who they paid premium for says, wait a second, you have to collect $26 million from them before our policies are implicated. So that's an impossibility that could never happen. But then they also offer to obtain co-counsel. That is correct. On the eve of trial, what had happened was in December of 2020, all of a sudden, Ekaterina Zlavik, whoever it is from CHUBB, sends an email to Mr. Marino and says, we've decided, we've elected our right to participate in the defense. We want to have Pete DeMahie come in. And you'll see from December until April 15, 2021, there's a negotiation for that defense. In the record, you'll see the reservation of rights letters right in the ray. It's three primary policies from CHUBB and three excess policies that they reserve rights on. They didn't reserve just on one policy. So Mr. Marino was, he's like, you know what? Withdraw all your reservation of rights, agree to defend us. And Mr. Marino testified, had they done that, there would have no cobalt agreement, no cobalt agreement would have happened. Now the testimony is the reason why the association, the tides settlement is relative to, is related to these cobalt agreement. There was cross indemnity provisions in the management agreement, where they had to indemnify each other. So Mr., the attorney for, who was it? Mr. Leonard. Mr. Leonard, who was retained by ACAM as, retained by the tides as coverage counsel says that he can't enter into any type of agreement unless ACAM is involved because there's cross indemnity. So what had happened was we initially started negotiating in December after a failed mediation. And this is important. What happened at mediation since they brought it up? Counsel was at the mediation. He refused to talk to anybody. The mediator, Jeff Streitfeld, got really pissed off that he refused to talk to anybody. Well, all that stuff is not in the record, Mr. Chiuza, so we really can't rely on it. You know what? I think it is. I think if you look at Mr. McCausland's testimony, he talked about the position that they took, but that's neither here nor there. So basically what it comes down to and what the lower court did in its order, granting summary judgment, they said there was never a denial of the obligation to defend because they defended under reservation of rights. They did not offer a defense until December of 2020, and that was conditioned. Mr. Marino tried to get them to withdraw all of the reservations, and they refused to do it. And at that point, that's when the hard negotiations happened with Mr. Marino and ACAM. That's where I started off at $20 million consent judgment. It got knocked down to $14.5 million. I asked for $350,000 from ACAM. That got knocked down to $250,000. And then I asked for $1.5 million against the tides, and that got knocked down to $1 million. There's a reason $1.25 million was paid to have the opportunity to enter into this covalence agreement, because the risk was there. They already had a summary judgment against them in a case where the documented economic damages alone were $22.3 million. It's not refuted in the record, okay? I have a life care plan, and this is unlike the Jimenez case. You've run way over your time, so I'll let you wrap up. I'm just going to wrap up on Jimenez, why it's important, because that was a covalence agreement before this very court, and the court basically set the parameters of what a bad covalence agreement was. In Jimenez, there was a death that occurred, and before a lawsuit got filed, before any depositions were taken, before any interrogatories were exchanged, no work-life tables, no life care plan, they agreed to settle for $1 million, and they didn't pay anything. The insured in that case didn't pay anything, and they rolled over against the carrier. That's not what happened here. What happened here was, because they had no choice but face of, and Mr. Marino said, a multi-million dollar significant and catastrophic judgment, they had no choice but to buy their way out of this. They paid $100 out of their own pocket. The carrier for three and a half years had eight experts. We just roll over on the carrier. They fought to the end, and the end they saw, and the death knell was when the court granted summary judgment against them. That's when this whole thing fell apart for them. Thank you, your honors. Thank you both. We're in recess for today.